**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| Joyce White, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | **Case No. 3:05-cv-404** |
| **v.** | ) | |
| | ) | **Judge Thomas M. Rose** |
| Copeland Corporation, et al., | ) | |
| | ) | |
| | ) | |
| *Defendants.* | ) | |

_____

**ENTRY AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT. (DOC. 37).**
_____

This matter is before the Court for decision on Defendants' Motion for Summary Judgment. (Doc. 37). In Count I of her complaint, Plaintiff Joyce White has charged Tom Crone and the Copeland Corporation with "Gender Discrimination (Quid Pro Quo Harassment) Federal Law (Title VII)." Count II asserts "Gender Discrimination (Hostile Environment) Federal Law Title VII" against all defendants: Dave Bell, Tom Crone, Larry Banas, and Copeland Corporation. Count III asserts "Retaliation under Federal Law" against all defendants. Count IV asserts a violation of 42 U.S.C. § 1981 against all defendants. Count V asserts gender and age discrimination in violation of Ohio Revised Code § 4112 against Copeland, Banas, and Crone, but not Bell, Count VI asserts retaliation under Ohio law against Bell, Banas and Copeland, but not Crone. Count VII charges Copeland with failure to properly supervise. Count VIII asserts "Intentional Infliction of Emotional Distress" against all defendants. Count IX charges a civil conspiracy. Count X asserts "Respondeat Superior/Agency," charging Copeland Corporation

with liability for the actions of Crone, Banas and Bell.  Defendants have collectively moved for summary judgment on all counts.

I.      **Background**

Because the Court is obliged to view the evidence in the light most favorable to the non-moving party, the Court will take its description of the background facts largely from Plaintiff's memorandum in opposition.  Doc. 50.

Plaintiff Joyce White began working at Copeland Corporation as a temporary worker in June 2002. (White Depo., at 128-29.)  While employed as a temporary worker, she was assigned the role of administrative assistant to Defendant Tom Crone. (White Depo., at 129.)  Crone began to make sexual overtures to White fairly aggressively. (White Depo., at 130-31, 135.)  One night, he asked Joyce White to drive from Sidney, Ohio to spend the night with him at a motel in Dayton, Ohio where he was going to be staying on business.  White agreed and began a sexual affair with Crone that night which lasted through 2003.  Throughout the course of the affair, White arranged meetings with Crone at motels, including the initial period of her temporary assignment.  The affair continued through another temporary assignment White had at Copeland. (White Depo., at 142-47.)

While they were still engaged in the affair, Crone assisted White in obtaining full-time employment at Copeland, which she began in May 2003. (White Depo., at 150-51, 157-160.)  She was hired to provide administrative support for a department called the Educational Services and Design Services Network, and her immediate supervisor was Larry Banas. (Banas Depo., at 11-13)  Crone continued his sexual relationship with White after she became a full-time employee, although he was the supervisor of her manager, Larry Banas, and had direct

-2-

supervisory responsibilities over her position. During that time the relationship remained a secret.

Late in 2003, White reunited with a former boyfriend, although she and Tom Crone continued to meet sporadically. In October of 2003, Crone and White attended a business meeting in Cincinnati. (White Dep. at 185-86; Crone Depo, at 57.) When White joined Crone in his hotel room, White testifies that:

> [Crone] wanted me to get in bed, and I told him I didn't want to have sex.
>
> Q. How did he respond when you said that?
>
> A. He was under the influence of alcohol that evening. And he told me to get in bed, or shut up and kiss him, he told me to get in bed, he wanted me naked in his bed. I don't remember it exactly verbatim. I told him I didn't want to.
>
> Q. Then what happened?
>
> A. He said it would be my job, he was the boss and if that's what...he wanted, that's the way it would be. Something to that effect. I don't remember verbatim.
>
> Q. Had you consumed any alcohol that evening?
>
> A. I had a few drinks, yes.
>
> Q. How did you end up in the same room with Mr. Crone?
>
> A. He called me and asked me to come down. And I went down.
>
> Q. Voluntarily?
>
> A. Yes.

> Q. And when you were voluntarily going down to his room, you knew he would be expecting to continue your sexual relationship, right?
>
> A. Yes.
>
> Q. So you got down there, and when he expected the sexual relationship you said no?
>
> A. I said no, yes.
>
> Q. What did you say when he made the comment about, as you put it, it's going to be your job, I'm the boss?
>
> A. I don't recall what my exact statement was. We ended up having sex that night.
>
> Q. Mr. Crone force[d] you to have sex that night?
>
> A. No, he didn't force me, other than the statement he made.
>
> Q. Even after he made that statement, though, you voluntarily had sex with him, right?
>
> A. Yes.

White Depo. at 187-89.

The next morning, Crone wanted sex again, and White refused. Crone then asked for a "hand job," which White gave him to get out of the hotel room. (White Depo., at 189.) White then informed Crone that if he "xxxxed with her job" that his wife would find out about their affair. (White Depo., at 278.)

Later, following a 2003 Christmas party at Copeland, Crone asked White to meet with him and other employees, including Rob Lehman, Sean Orban, Wendell Brown, and Larry

-4-

Banas, at a local bar. (Crone Depo., at 69.) White said she would meet with him, but ultimately chose not to appear, causing Crone to question her as to why she did not show up. (Crone Depo., at 69-71.)  Crone did not fully realize that their romantic relationship had ended until Spring of 2004, when he received an anonymous letter linking White to her ex-boyfriend, Steve Bennett. (Crone Depo, at 72.)

On April 8, 2004, a work place incident occurred where Defendant Dave Bell verbally abused White and began screaming at her due to ongoing difficulties in communications between Bell and White.  Defendant Larry Banas ordered Bell to stop and to apologize, which he did, but he began screaming at her again after they left Banas's presence.  Copeland employees who witnessed the exchange believed that Bell had acted inappropriately. (Smith Depo., at 25; Leskovsky Depo., 66-67.)

Plaintiff Joyce White reported this and other harassment that she perceived to Crone, who promised that he was working on solving the problem.  White later discovered that Crone had never relayed any of White's concerns to human resources. (White Depo., at 240-44.)  In September 2004, Joyce White received a performance review from Banas, which criticized her performance, in part because, as Banas stated in the written review, he would "not accept victim status from anyone in our group.  Simply put, if you are not part of the solution, you are part of the problem." (White Depo., at 182.)

White refused to sign the review.  White disagreed with Banas's assessment that she needed to improve in planning and organization and in interpersonal relations, teamwork and communications.  (White Depo., at 193-94, and Ex. 26).  On November 1, 2004, White gave Banas a "formal request for information" asking him to give examples to support his concerns about her performance. (White Depo. at 202-03, and ex. 27.)  Copeland proceeded with its

standard annual performance management program, developing a 2005 performance plan for White.

On November 11, 2004, Banas gave White a Performance Plan that he and Human Resources Manager Ann Runner had devised. (White Depo., at 203, and ex. 28; Runner Depo., at 101, 125; Banas Depo., at 51, 91.)  White's 2005 performance plan demanded that White take certain actions, for example, White was ordered to take a class in the use of Peachtree software. When Banas and Runner met with White, she persisted in refusing to sign the performance review and reacted negatively to the performance plan.  (White Depo., at 181-82, and ex. 26; Runner Depo., at 63, 94-95, 126).

At some point, Larry Banas decided that he wished to have White terminated from her employment at Copeland.  The first discernible evidence of this intention begins around October 2004, when Larry Banas asked a Copeland employee named Karla Leskovsky to report to him any incidents in which White made a mistake or failed to perform. (Leskovsky Depo., p, 30-34.)

In November 2004, White was given a first, "oral," warning for having missed four full days of work and one partial day of work without permission. (Runner Depo., ex. 11, Doc. 44-3 at 22.)  In late 2004 or early 2005, Banas told Sean Orban to monitor the attendance of White. (Orban Depo., at 34-40).  In February 2005, White received a written warning, being disciplined for taking two full days and portions of two other days in January for personal leave. (Runner Depo., Ex. 13.) [1]

---

[1] Another employee in a different type of position, Amy Thomas, Tom Crone's executive secretary, took similar amounts of time, or greater amounts, off from work and faced no criticism, discipline, nor written warnings. (Thomas Depo., at 27; White Depo, at 235-36.) According to White, Scott Lanzer and Dave Bell did not abide by company attendance rules. (White Depo., at 236.)

In January 2005, as part of Copeland's continued attempt to finalize White's 2004 performance management program, Runner met with White.  At this meeting, White verbally announced that she was lodging a "formal complaint" accusing Dave Bell, Larry Banas, Tom Crone, Rob Lehman, and Sean Orban of general harassment. (Runner Depo., at 18-21, 62, 304-05).  In January 2005, as a part of her initial investigation into the harassment White alleged, Runner ordered Gwendolyn Wilker to conduct an audit of the work e-mail accounts of Joyce White, Dave Bell, and Scoot Lanzer to look for inappropriate material. (Wilker Depo., at 22-23, 26).

Among other parts of the investigation, Runner interviewed one of Plaintiff's co-worker's, Brion Smith.  Smith asserted that he was "one of the few employees that she [White] hasn't had a run-in with at some point." (Smith Depo, at 37; Runner Depo., at 42-43.)  Smith's testimony, however, is internally contradictory, as he admits in his deposition that this was his statement, (Smith Depo., at 37), later characterizes it as a "fair" one, *Id.* at 42, but in between states, in effect, that White had run-ins with no one at the company besides Bell. (Smith Depo., at 25, 37-42)

As a consequence of White's complaint and the ensuing investigation, Bell was removed from the department on February 22, 2005 and ordered not to have contact with Joyce White anymore. (Runner Depo., at 161.)  Runner also agreed to look at White's 2004 review to see if any complaints or issues about her performance stemmed from White's interactions with Bell and, if so, remove them. (White Depo., 421-22, and ex. 52; Runner Depo., at 175).  White claims, however, that Runner also pressured her to change departments, which White refused to do.  (White Depo., at 264, 421, and ex. 52; Runner Depo, at 161; Banas Depo., at 81).

White's formal complaint did not mention any aspect of her affair with Crone.  Runner's investigation did not learn of it, either.

As the Spring progressed, Larry Banas concluded that White's performance had declined since November 2004 and needed improvement. (White Depo., at 211, and Ex. 30.)  After consulting with Runner, Banas issued a written warning to White and gave her a revised performance plan on March 10, 2005. (White Depo., at 214-18, and Exs. 32-33; Runner Depo., at 113-14, 222; Banas Depo., 195-97).  This revision noted that White's interaction with Larry Banas was still strained, since a November 2004 incident where White had surreptitiously recorded a conversation with Banas and another colleague. (White Depo, at 211, and Exs. 30, 60; Runner Depo. at 111-12, 115, 151, and Ex. 12; Banas Depo., 184-89; Lehman Depo, at 81-85, 92-99, 102-05.)  White refused to sign the written warning, telling Banas and Runner that she had retained an attorney and would be filing retaliation and discrimination charges with the EEOC. (White Depo., at 214, 215).

On April 6, 2005, Banas sent an e-mail to Runner stating, inter alia, "I repeat my request for an immediate dismissal of Joyce White." (Banas Depo., Ex. 37.)  Later on April 6, 2005, Runner sent an e-mail to Banas stating "On Monday – we need to put all examples of not meeting expectations on the table (anything since March 10th)" and then listing possible areas of inquiry where White may not have performed. (Banas Depo., Ex. 38.)

On April 20, 2005, White and her lawyer met with Several Copeland representatives to discuss White's concerns about her employment.  (Runner Depo., at 267-68, 274, 276.)  At this meeting, White stated that she was going to take medical leave for anxiety and depression. (Runner at 279.)  Copeland granted her request, and White remained on medical leave until May 23, 2005. (White Depo., at 117-18, and Ex. 9.)  When she returned to work, White learned that

Tom Crone would no longer have any managerial responsibility for her. (White Depo., at 294-95, and Ex. 58; Banas Depo., at 277.) Crone was removed from managerial responsibility for White, because after he received a voice mail from White informing him that she was going to sue, Crone informed several Copeland executives of his affair with White. (Crone Depo., at 53-56, 76-83, 103-104.) These executives apparently removed White from Crone's authority, but did not inform Runner of the affair.

Upon her May 23, 2005 return, White again met with Banas and Runner, who issued a second and final written warning to White for substandard job performance. Runner affies that this written warning was planned in April 2005, but was not delivered until White's return. (Doc. 37, Ex. 1 ¶ 3.) White was warned that if her performance did not improve, she faced further disciplinary action, up to and including termination. (White Depo., Ex. 40.) As with her prior written warning, White refused to sign this final written warning as well. (*Id.*)

The day following her return to work, May 24, 2005, White approached co-worker Steve Hamby and asked to speak with him in confidence. (White Depo., at 280, and Ex. 55; Hamby Depo., 13-14.) White told Hamby that she was being sexually harassed and that Tom Crone had created a job for her at "DSN in educational services" for her. (White Depo. at 280-81, Hamby Depo., at 16-17.)

Thereafter, Hamby contacted his supervisor, Rob Lehman, and told him that an employee had come to him with an accusation of sexual impropriety. (Hamby Depo., 24-25.) This conversation prompted Hamby to prepare a memorandum summarizing his conversation with White, which Hamby presented to Ann Runner. (Hamby Depo., at 29-33, 41, White Depo., Ex. 55; Runner Depo., at 50, 52-53.) Later, Brion Smith, who reports to Hamby, told Hamby about a

conversation he had with White along the same lines. (Smith Depo., at 13; Hamby Depo., at 9-13, 37, 68, 72).  Smith also relayed his conversation with White to Runner.

Acting on the information she received from Hamby, Runner initiated a sexual harassment investigation. (Runner Depo., at 35-50.)  On June 2, 2005, Runner attempted to speak with White, but White refused to give Runner any information, telling Runner that she could speak to her attorney. (White Depo., at 292-93, and Ex. 57; Runner Depo., at 37.)  On June 6, 2005, Runner sent a memorandum to White again asking for her cooperation in the investigation. (White Depo., at 292-93, and Ex. 57; Runner Depo., at 50-51.)  White did not respond.  Instead, on June 7, 2005, she requested a second medical leave of absence, retroactive to June 6, 2005. (White Depo., at 119-20, and Ex. 10.)  Copeland approved this leave request. (White Depo., Ex. 11.)  White has not returned to work at Copeland, and remains an employee.

Six months later, on November 28, 2005, White filed the instant action against Copeland Corporation, Tom Crone, Larry Banas, and David Bell.

## II.     Jurisdiction

This case is before the United States District Court for the Southern District of Ohio on Defendant's Motion for Summary Judgment.  This case deals with alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*, and of Chapter 4112 of the Ohio Revised Code, §§ 4112.02(A) & 4112.99.  Pursuant to 28 U.S.C. § 1331, the District Courts of the United States have original jurisdiction to hear matters that arise under the laws of the United States. 28 U.S.C. § 1331.  In addition, pursuant to 28 U.S.C. § 1367, in any civil action of which the District Courts have original jurisdiction, the District Courts have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States

Constitution. 28 U.S.C. § 1367.  This case is properly before this Court under 28 U.S.C. § 1331 because this case deals with federal law, specifically Title VII of the Civil Rights Act of 1964. Finally, this Court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367 because the state claims arise under the same case and controversy as the federal claims.

## III.    Standard of Review

The standard of review for motions for summary judgment is established by Federal Rule of Civil Procedure 56 and associated case law.  Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).  Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions and affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.*, at 323.  The burden then shifts to the nonmoving party who "must set

-11-

forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S., at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S., at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson*, 477 U.S., at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not…obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties.

In addition to moving for summary judgment on the federal claims, Defendants also seek summary judgment on claims brought under Ohio law. In reviewing an Ohio claim, this Court

must apply the law of Ohio, as interpreted by the Supreme Court of Ohio. *Northland Ins. Co. v. Guardsman Prods. Inc.*, 141 F.3d 612, 617 (6th Cir. 1998). Specifically, this Court must apply the substantive law of Ohio "'in accordance with the then-controlling decision of the highest court of the State.'" *Imperial Hotels Corp. v. Dore*, 257 F.3d 615, 620 (6th Cir. 2001) (quoting *Pedigo v. UNUM Life Ins. Co.*, 145 F.3d 804, 808 (6th Cir. 1998)). Also, to the extent that the highest court in Ohio has not addressed the issue presented, this Court must anticipate how Ohio's highest court would rule. *Id.* (citing *Bailey Farms, Inc. v. NOR-AM Chem. Co.*, 27 F.3d 188, 191 (6th Cir. 1994)).

## IV.    Analysis

In Count I of her complaint, Plaintiff Joyce White has charged Tom Crone and the Copeland Corporation with "Gender Discrimination (Quid Pro Quo Harassment) Federal Law (Title VII)." Count II asserts "Gender Discrimination (Hostile Environment) Federal Law Title VII" against all defendants: Dave Bell, Tom Crone, Larry Banas, and Copeland Corporation. Count III asserts "Retaliation under Federal Law" against all defendants. Count IV asserts a violation of 42 U.S.C. § 1981 against all defendants. Count V asserts gender and age discrimination in violation of Ohio Revised Code § 4112 against Copeland, Banas, and Crone, but not Bell, Count VI asserts retaliation under Ohio law against Bell, Banas and Copeland, but not Crone. Count VII charges Copeland with failure to properly supervise. Count VIII asserts "Intentional Infliction of Emotional Distress" against all defendants. Count IX charges a civil conspiracy. Count X asserts "Respondeat Superior/Agency," charging Copeland Corporation with liability for the actions of Crone, Banas and Bell. Defendants have collectively moved for summary judgment on all counts.

A.      **Count I - "Gender Discrimination (Quid Pro Quo Harassment) Federal Law"**

In Count I of her complaint, Plaintiff Joyce White has charged Tom Crone and the Copeland Corporation with Gender Discrimination (Quid Pro Quo Harassment) under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.  Section 703(a) of Title VII forbids

> an employer-
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's…sex.

42 U.S.C. § 2000e-2(a)(1).

Defendants assert that Joyce White cannot prevail on her "Quid Pro Quo" Title VII claim against Crone and Copeland, because, they allege, no tangible employment action was taken against her and Crone did nothing to make White's working environment hostile after their affair ended.  Doc. 37 at 18.  Defendants cite for this position *Burlington Industries, Inc., v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257 (1998).  *Ellerth*, however, deals with "whether an employer has vicarious liability when a supervisor creates a hostile work environment by making explicit threats to alter a subordinate's terms or conditions of employment, based on sex, but does not fulfill the threat."  *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 754 (1998).  The instant case is distinct from *Ellerth*, in that the *Ellerth* plaintiff did not accede to the sexual demand made.

Defendants agree that "neither the Sixth Circuit nor the Supreme Court has addressed the issue of whether an employer can be held strictly liable when an employee submits to a supervisor's sexual demands because she reasonably believes that her benefits or continued

-14-

employment are conditioned upon her acquiescence." Doc. 65 at 6. The Second Circuit has addressed this issue, however, noting:

> Requiring an employee to engage in unwanted sex acts is one of the most pernicious and oppressive forms of sexual harassment that can occur in the workplace. The Supreme Court has labeled such conduct "appalling" and "especially egregious." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22 (1993). It is hardly surprising that this type of conduct--a classic quid pro quo for which courts have traditionally held employers liable--fits squarely within the definition of "tangible employment action" that the Supreme Court announced in *Faragher* and *Ellerth*.

*Jin v. Metropolitan Life Ins. Co.*, 310 F.3d 84, 94 (2d Cir. 2002). This Court will follow the Second Circuit conclusion as to whether an employee's accession to a supervisor's sexual demands when the employee reasonably believes that her benefits or continued employment are conditioned upon her acquiescence constitute an tangible employment action.

Here, White has evidence that, in October of 2003, when Joyce White declined Tom Crone's request that she get in his bed, he responded to the effect that he would have her fired if she did not comply. White Depo. at 187. Following *Jin*, it becomes apparent that a jury could find that Copeland took an adverse employment action against White. With this point resolved, the application of Supreme Court precedent to the case at hand is straightforward.

In 1998, the Supreme Court clarified the standard applicable to both hostile work environment claims of the sort alleged in Count II, and supervisor harassment culminating in tangible employment actions of the sort alleged in Count II:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a

-15-

> defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, *see* Fed. Rule Civ. Proc. 8(c).  The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense.  And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.  No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 764-65 (1998).

In the instant case, there is admissible evidence that could lead a reasonable juror to conclude that Crone, a person at Copeland Corporation with "successively higher" authority over White, took a tangible employment action against White.  Defendants counter that White must prove that Crone's overtures were "unwelcome."  Doc. 65 at 7 (citing *Highlander v. K.F.C. Nat. Management Co.*, 805 F.2d 644 (6th Cir. 1986)), a case involving "failure to engage in the activity suggested by" a supervisor.)  White has testified that she had informed Crone that she did not want to have sex that night.  Whereupon, Crone resorted to coercion to attain his desire. The overture was unwelcome.  While White answered, "Yes," when asked: "Even after he made the statement, though, you voluntarily had sex with him, right?" (White Depo., at 189), a jury may still conclude that White was coerced.  She did not act willingly.  Moreover, her threat to

-16-

Crone, should he ever "xxxx[] with her job" bolsters this inference.  Wherefore, the Court will deny Defendants' motion for summary judgment as it pertains to Count I of the complaint.

**B.     Count II - Gender Discrimination (Hostile Environment) Under Title VII**

To establish a hostile-work-environment claim, a Plaintiff must show that "(1) she was a member of a protected class; (2) she was subject to unwelcome[] sexual harassment; (3) the harassment was based on her sex; ... (4) the harassment created a hostile work environment;" and "(5) the supervisor's harassing actions were foreseeable or fell within his or her scope of employment, and the employer failed" to take "reasonable care to prevent and correct any sexually harassing behavior."  *Kestner v. Stanton Group, Inc.*, 202 Fed. Appx. 56, 58 (6th Cir. 2006) (citing *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560-61 (6th Cir.1999)).  The Court will currently assume that each of these factors are met.

Copeland, however, has a sexual harassment policy with which White refused to comply.  According to the *Ellerth* defense for harassment claims, a claim will fail if (a) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.  *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 764 (1998).  "[W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense."  *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 764-65 (1998).

In the instant case, Copeland has a sexual harassment policy with a complaint procedure, a copy of which White had received, read and agreed to follow. (White Depo., 164-65, and Exs. 17, 20.) The policy clearly states that continuation of any sexual conduct if consent is withdrawn by one of the employees involved constitutes sexual harassment. White Depo., Ex. 20. The policy further instructs an employee who believes they have been sexually harassed to immediately contact the Human Resources Manager, his or her supervisor or manager, or any other member of management, including Copeland's Senior Vice President of Human Resources, whose number is given. *Id.* White never followed this policy.

She spoke of the incident not immediately, but only six to seven months later, and not to persons in authority, but to co-workers Steve Hamby and Brion Smith. When an investigation was initiated due to Steven Hamby reporting the incident to Human Resources, White refused to cooperate. "[S]howing an[] unreasonable failure to use any complaint procedure provided by the employer…will normally suffice to satisfy the employer's burden under the second element of the defense." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 764-65 (1998). Copeland has successfully carried its burden as regards the affirmative defense, and summary judgment will be granted to Defendants for any hostile environment claim stemming from any actions of Crone separate from his *quid pro quo* actions.

As for the actions of Bell and Banas, there is no evidence to link them to Crone's activities with White, nor is there evidence to show that they were based on sex, rather than personal animosity. Compare *Curry v. Nestle USA, Inc.*, 2000 WL 1091490, *4 (6th Cir. 2000); see also *Barnett v. Department of Veterans Affairs*, 153 F.3d 338, 342-43 (6th Cir. 1998) ("personal conflict does not equate with discriminatory animus"). Additionally, the actions of

Bell and Banas are not sufficiently severe or pervasive to constitute harassment that would form the basis for a hostile work environment claim.  See *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (to prevail, the employee must show conduct that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and [to] create an abusive working environment.")  Conduct that is "merely offensive" will not suffice to support a hostile work environment action. See *Harris*, 510 U.S. at 21; see also *Trepka v. Board of Educ.*, 28 Fed. Appx. 455, 461 (6th Cir. 2002).  Wherefore, summary judgment will be granted to Defendants on Count II.

## C.    Count III - Retaliation Under Federal Law

The 1964 Civil Rights Act protects an employee who has "opposed any practice made an unlawful employment practice" by Title VII or who has made a charge under the statutory scheme. 42 U.S.C. § 2000e-3(a) (1988).  Like a disparate treatment claim, proof of a retaliation claim under federal employment discrimination law is governed by the *McDonnell Douglas/Burdine* tripartite framework of shifting burdens of production and proof.  *Harrison v. Metropolitan Government of Nashville and Davidson County, Tenn.*, 80 F.3d 1107, 1118 (6th Cir. 1996) (citing *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987)).  In order to establish a prima facie case of retaliation, a plaintiff must establish that: (1) he engaged in activity protected by Title VII; (2) the exercise of his civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. See *Harrison v. Metropolitan Gov't*, 80 F.3d 1107, 1118 (6th Cir. 1996) (citing *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987)).  The adverse action of the third prong need not be an employment action,

-19-

but merely materially adverse. *Burlington Northern & Santa Fe Ry. Co. v. White*, 126 U.S. 2405, 2416-18 (2006).

To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not engaged in an activity protected by Title VII. See *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997); *Jackson v. RKO Bottlers*, 743 F.2d 370, 377 (6th Cir. 1984). Although no one factor is dispositive in establishing a causal connection, evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation. See *Moon v. Transport Drivers, Inc.*, 836 F.2d 226, 230 (6th Cir. 1987). The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met. See *Avery*, 104 F.3d at 861. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

In the instant case, there is no evidence of an adverse action being taken against White after she exercised her Title VII rights to terminate the affair and complain of harassment by Bell and Banas. Even assuming arguendo that Copeland's job evaluations and the reprimands for truancy constitute an employment action, there is no evidence that these actions were taken due to White's decision to cease her affair with Crone. Indeed, these actions began before Crone knew that his affair with White had ended. There is no evidence that anyone at Copeland, besides White and Crone, was aware of the affair when these actions were being taken. See White Depo., at 141, 165, 281. Therefore, summary judgment will be granted on White's retaliation claim under federal law.

**D.      Count IV - Violation of 42 U.S.C. § 1981 against all Defendants**

Count IV asserts a violation of 42 U.S.C. § 1981 against all Defendants.  White's Response to the motion for summary judgment acknowledges that her § 1981 claim fails.

**E.      Count V - Gender and Age Discrimination in Violation of Ohio Revised Code § 4112 Against Copeland, Banas, and Crone**

Count V asserts gender and age discrimination in violation of Ohio Revised Code § 4112 against Copeland, Banas, and Crone, but not Bell.  White admits in her response that her age discrimination claim fails.  Doc. 50 at 18.

As for her gender discrimination claim under Ohio law, Ohio courts analyze claims under that statute by reference to federal case law interpreting Title VII. *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981); *see also Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 469 (6th Cir. 2002); *Cline v. Catholic Diocese*, 206 F.3d 651, 668 (6th Cir. 2000), *Shah v. Deaconess Hosp.*, 355 F.3d 496, 499 (6th Cir. 2004). Because Ohio law claims of gender discrimination are analyzed similarly to federal claims, the motion for summary judgment will be denied as regards the quid pro quo actions of Tom Crone, for the reasons stated in section IV.A, but granted with regard to the actions of Banas.

**F.      Count VI - Retaliation Under Ohio Law Against Bell, Banas and Copeland**

Count VI asserts retaliation under Ohio law against Bell, Banas and Copeland, but not Crone.  To establish a *prima facie* case of retaliation under Ohio law:

> a plaintiff must prove that: 1) the plaintiff was engaged in a protected activity; 2) the defendant knew of the plaintiff's participation in the protected activity; and 3) the alleged retaliatory action followed the plaintiff's participation in the protected

> activity sufficiently close in time to warrant an inference of
> retaliatory motivation.

*Parker v. Bank One, N.A.*, 2001 WL 303284, *8 (Ohio App. 2001).  Because the analysis for

retaliation under Ohio law is identical to that for a claim of retaliation under federal law, the

motion for summary judgment will be granted on Count VI for the reasons stated in IV.C.

## G.      Count VII - Failure to Properly Supervise Against Copeland

Plaintiff's seventh cause of action states a claim under Ohio common law for negligent

supervision.  Defendant asserts that such a claim is derivative in that it requires an underlying

tort to succeed.  Doc. 50 at 18.  "Defendants oppose this claim *solely* on the ground that the

underlying torts that have been alleged against the individual defendants...cannot withstand

summary judgment."  *Id.* (emphasis added).  Because the Court has found that the claim in the

first count survives the challenge posed to it by Defendants' motion, the motion will also be

denied as regards Count VII.

## H.      Count VIII - Intentional Infliction of Emotional Distress Against All Defendants

Count VIII asserts Intentional Infliction of Emotional Distress against all Defendants.

Under Ohio law:

> A claim for intentional infliction of emotional distress requires
> proof of the following elements: (1) that the actor either intended
> to cause emotional distress or knew or should have known that
> actions taken would result in serious emotional distress to the
> plaintiff, (2) that the actor's conduct was so extreme and
> outrageous as to go beyond all possible bounds of decency and was
> such that it can be considered as utterly intolerable in a civilized
> community, (3) that the actor's actions were the proximate cause
> of the plaintiff's psychic injury, and (4) that the mental anguish
> suffered by the plaintiff is serious and of a nature that no
> reasonable man could be expected to endure it. *Ashcroft*, 588
> N.E.2d 280. Serious emotional distress requires an emotional

injury which is both severe and debilitating. *Paugh v. Hanks*, 451 N.E.2d 759 (Ohio 1983).

*Yeager v. Local Union 20*, 453 N.E.2d 666, (Ohio 1983) used the description of extreme and outrageous conduct found in Restatement of the Law 2d, Torts (1965) 71, Section 46:

" ' * * * It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

"'The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam. See Magruder, *Mental and Emotional Disturbance in the Law of Torts*, Harvard Law Review 1033, 1053 (1936). * * *'" *Id.*, 453 N.E.2d at 671-672.

*Burkes v. Stidham*, 668 N.E.2d 982, 989-90 (Ohio App. 1995).

The instant case falls close to this standard. It certainly does not involve "harmless steam," "a mere insult," nor a "petty oppression." If the proffered evidence is to be believed, Crone used a threat to obtain sexual favors from a willing participant in an affair who was then presently unwilling to engage in sex. This is possibly criminal, and the Court has already stated

that it would be tortious, if believed by a jury. Under Ohio law, however, this is not sufficient to carry a claim of intentional infliction of emotional distress.

Plaintiff's response makes an abortive attempt to explain the relevance of *Hampel v. Food Ingredients Specialties, Inc.*, 729 N.E.2d 726 (Ohio 2000). The Court has analyzed the facts of this intentional infliction of emotional distress case, and notes that it involves crude solicitation of sex from someone with whom the co-worker did not have an ongoing voluntary sexual relationship. Such is not the case here. The Court finds that this act, if proven, falls somewhat short of that. Therefore, summary judgment will be granted on White's motion for summary judgment on this claim.

## I.     Count IX - Civil Conspiracy.

Count IX asserts a civil conspiracy, apparently against all Defendants. According to the United States Court of Appeals for the Sixth Circuit, the following elements must be proven in order to establish a claim of civil conspiracy in Ohio:

> (1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Universal Coach, Inc. v. New York City Transit Auth., Inc.*, 629 N.E.2d 28, 33 (Ohio App. 1993). The first of these elements… "does not require a showing of an express agreement between defendants, but only a common understanding or design, even if tacit, to commit an unlawful act." *Gosden v. Louis*, 687 N.E.2d 481, 496 (Ohio App. 1996).

*Aetna Cas. and Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 538 (6th Cir. 2000). With respect to the level of agreement that must be established, the Sixth Circuit has stated that "[a]ll that must be shown is that…the alleged coconspirator shared in the general conspiratorial objective…." *Id.* (quoting *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985)). At the same time, the degree of involvement required for civil conspiracy is higher than that for civil aiding

-24-

and abetting.  *Id.*  Whereas "[a]iding-abetting focuses on whether a defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct," conspiracy focuses "on whether the defendant *agreed to join in* the wrongful conduct."  *Id.* (quoting *Halberstam v. Welch*, 705 F.2d 472, 478 (D.C. Cir. 1983) (emphasis added in *Leahy Const. Co.*)).

In the instant case, there is no evidence of an agreement among the Defendants to achieve any common objective.  Plaintiff refers the Court to page 216 of her deposition for "overwhelming evidence" of the existence of a conspiracy, but the Court has found none there. Because there is no evidence of the existence of a civil conspiracy, summary judgment will be granted to Defendants on this count.

**J.      Count X - "Respondeat Superior/Agency," Against Copeland Corporation**

For the reasons stated in parts IV.A and IV.B, summary judgment will be granted on the claim of respondeat superior liability against Copeland for the allegations of hostile work environment harassment, but not on the alleged *quid pro quo* harassment of Crone.  The Court notes that only Copeland faces liability under Plaintiff's theories:

> In *Wathen v. General Electric Co.*, 115 F.3d 400 (6th Cir. 1997), the Court ruled that "[a]n examination of the statutory scheme and remedial provisions of Title VII, convinces us that Congress did not intend to provide for individual employee/supervisor liability under Title VII." *Id.* at 405.  The Court found that the statutory scheme of limiting liability to employers with fifteen or more employees demonstrated a congressional intent not to impose liability on individuals. *Id.*  The Court agreed with the Second Circuit's conclusion in *Tomka v. Seiler Corp.*, 66 F.3d 1295 (2d. Cir. 1995) that it is "inconceivable that a Congress concerned with protecting small employers would simultaneously allow civil liability to run against individual employees." *Wathen* at 406.

*Russell v. Bronson Heating and Cooling*, 345 F. Supp. 2d 761, 782 (E.D. Mich. 2004).  Neither

does individual liability appear to exist under Ohio law.  *Gallaunt v. Rose Mfg. Co.*, 1997 WL

614401, *2 (N.D. Ohio 1997) (gathering cases pro and con).

**V.     Conclusion**

Because Copeland is strictly liable for the actions of a supervisor who takes a tangible

employment action against an employee, the motion for summary judgment will be **DENIED**

with regard to Counts I, V, and X.  Because Copeland can avail itself of the *Ellerth* defense, the

motion for summary judgment is **GRANTED** with regard to Count II.  Because there is the

possibility of an underlying tort upon which Copeland could face liability, the motion for

summary judgment is **DENIED** with regard to Count VII.  Because there is no evidence of

retaliation, the motion for summary judgment is **GRANTED** with regard to Counts III and VI.

Because Crone's actions were insufficiently outrageous to support a claim of intentional

infliction of emotional distress, the motion will be **GRANTED** with regard to Count VIII.

Because there is no evidence of a common objective in civil conspiracy the motion is

**GRANTED** with regard to Count IX.  Because Plaintiff has abandoned the claim in Count IV,

the motion is **GRANTED** with regard to Count IV.

**DONE** and **ORDERED** in Dayton, Ohio, Saturday, August 25, 2007.


                                                          s/Thomas M. Rose

                                              _____
                                                          THOMAS M. ROSE
                                              UNITED STATES DISTRICT JUDGE